Good morning, Your Honors. Mayor Westreich for the appellants, and I'd like to reserve five minutes for rebuttal. All right, I'll try to help you out, but keep your eye on the clock as well. I'll do that. The issue of avoided costs, which is central to this appeal and central to this case, has been an issue that has dogged the courts, the government really, everybody involved in it since PURPA was originated in 1978 for the entire 40 years. And it started with a statute that seemed to only set a ceiling, but a regulation that was a few years later approved by the Supreme Court that also created a floor, so that we then got the term full avoided costs. But then the utilities never liked that. They fought that regulation and lost, and then they've been struggling against it ever since and trying to find ways to make the avoided costs less than the full avoided costs. And frequently it has boiled down to arguments like, where do you include capital costs and what are capital costs? They use the term capacity costs because that's a little bit narrower than capital costs. Capital costs include capacity, but can include other things. Then they got into the argument about multi-tiered, and there's been a considerable amount of adjudication about that. And what is significant about that is that- Can I interrupt you just a moment? Sure. It was unclear from your brief which program you said had a problem with not using the Well, both of them. The NEM program, which is what my clients are in, willy-nilly. One of the odd things about, which we don't really understand, is that PUC has argued, the court ruled that my clients could have gotten a QF contract if they wanted it. But we presented plenty of evidence that my clients tried for years pleading with PG&E to give them a contract, but they were forced into the NEM program. They were never given a choice. And so, evidence being the way it has to be evaluated on summary judgment, the evidence of the plaintiffs has to be believed. There has been no contrary evidence that PG&E said, no, here, we'll give you a QF contract, and they said no. The uncontradicted evidence is from the opponents is that they tried to get a QF contract instead of being under the NEM program, and they just were simply ignored and refused. All right, counsel. Let me just sort of narrow your focus a bit, because you mentioned that this is summary judgment that we're reviewing. With one exception. With the leave to amend issue. But the district court had indicated that there's a lack of evidence in the record to support some of your claims. Let's talk about them one by one, and I want to make sure that I understand your arguments, because I was really struggling to go through to figure out, like Judge Marbley, which program are you talking about? In what way was the full avoided cost calculation erroneous? And where in the record is there support for your position that it should be calculated differently? So can we start with the capacity cost issue with regard to the NEM program? What are you saying was wrong with the calculation of avoided cost in the NEM program? Because they did not distinguish between, their capacity costs don't in any way distinguish between the different types of energy that are involved. And so in other words, they're not talking about capacity for non-renewable energy that they would have to implement if they did not get the non-renewable energy. Most of the NEM, the 600,000, almost all of them are people who have solar panels. This is non-renewable energy. If the 600,000 NEM participants suddenly were erased, they were no longer producing, you'd have a fairly significant amount of energy involved. If they had to replace that with a solar capacity, not gas turbine, not fossil fuels, the cost difference would be significantly different because they can rely on older facilities for the fossil fuels or slightly upgrading them in order to produce that. To do, to replace those 600,000 NEM participants, they would have to do a fairly substantial, but they would have to also provide the data, which they haven't done. There is no data that the POC requires them to do to say, which is one of the factors they're supposed to consider in avoided cost, they're supposed to require the utilities to provide the data. The utilities don't provide the data based on multi-tiered. And so there is no way of knowing what it would actually be because the law presupposes that information would come from the utilities. They would say, okay, if we had to replace all of these with non-renewable energy sources, i.e. solar, what would it cost them to do it? And nowhere in any of the analysis that is done by either the state or by the court, do they address that multi-tiered issue. They just treat it, oh, they say this. And is there evidence in the record that indicates that NEM participants offer capacity value to the utility? Well, it's not a question of whether they offer capacity value. That's a misnomer. That's a mistake. It's not their capacity that matters. It is the capacity of the utility that would have to be created by the utility to replace the capacity of the supplier. Avoided cost is the capital cost of the utility if there was an absence of the capacity of the supplier. So it doesn't matter what it costs CARE to create their solar panels or the 600,000 to do it. The question is what would the utility have to spend to replace that capacity using their own money and raising and building the capacity that they don't have as of now in order to provide that energy that is being supplied by other people? As I understand the district court's analysis, it said that the net surplus that's generated by NEM participants really have no capacity value because the participants don't have to provide any energy to the utility, that there's no obligation on behalf of all of these homeowners with solar panels to provide any energy to the utility. Where is the error in that analysis? Because again, he's talking about what their capacity is. The judge was talking about the capacity costs of the suppliers, but they've already spent the money when they joined the district. They've already put the solar panel on their physical either residence or business. It is already done, but that's not the issue. The issue is not the capacity costs of the supplier. The issue is if you eliminated the 600,000 right now, tomorrow, and they suddenly had to supply the balance, what would it cost them to have to supply that balance? And you can't say that they don't have to provide the information about what it would cost because nobody else can do that. And if the PUC doesn't require, here's one of the funny things about the purple law. When you have a regulated utility, in the states where you have regulated utilities, you cannot sue the utility for not providing you this or not providing you that. You can only sue the regulating agency. They did it as a kind of federalism concept. Only in states where there is no regulating agency can you go directly at the utility on a purple violation. So all we can do is say to the PUC, you've got to enforce these rules. You've got to make the utilities provide this information. And you have to approach it from the multi-tiered approach. They're rejecting the multi-tiered approach. And that is the problem. And when they talk about the capacity cost that is inherent... Are there any support for the notion that the multi-tier approach is mandatory? Is it their discretion or are they mandated to accept the multi-tiered approach in calculating avoided cost? We discussed that at rather great length actually in our opening brief and gave us a series of quotes. And there was a case where the court seemed, suggested, I mean, excuse me, the FERC seemed to suggest that maybe it's not mandatory, but in that same case, though, they struck the use of the gas turbines in that case as the capacity cost basis. They said, well, we're not going to let you use this one in this particular case. And so you have to look at it with the underlying policy is of what PURPA is. One of the underlying policies of PURPA is non-renewable energy versus renewable energy. And it isn't just a green concept. It was also a concept that was based on the assumption that it is... We are trying to avoid having to be dependent on fossil fuels that have a terminable amount of potential fuel there. Non-renewable is the term that in and of itself tells you what the policy is. Excuse me, renewable energy tells you what the policy is. We want to use renewable energy as a strategic decision to make more energy available in the American market that won't make us dependent on foreign sources, that won't make us dependent on depleted fossil fuel sources, even within our country. So if you don't do the multi-tiered, you're not going to encourage the renewable energy by doing that. The intent was to encourage the renewable energy. Now I'm already down less than my five minutes and I'm going to use another minute or so because I want to make another point. If we get past this point, they keep using the term market concepts in their term. You cannot have market concepts and avoided costs at the same time. It's not possible. Avoided cost means what did it cost you? Market says what the market will bear. That's why businesses go out of business when you have a free market because they can't get their costs recovered when somebody is able to do it cheaper than them. When you start talking about market, you are already talking about something that is not just what did it cost you? And you've got to pay what it cost you regardless of the market. And this market concept is what is also undermining the avoided cost as a floor. But it's not a pure market concept though, is it? Because the statute sort of determines that a certain percentage or mandates that a certain percentage of the energy used will be renewable energy, but not all of it. Correct, but the point- But when you're just talking about avoided costs, you're still talking about what were your costs, not what it might cost me. I mean, the only thing that the market comes into that is you might use the market to figure out what it would cost for that in a multi-tiered for that particular item. But you don't talk about the market cost of the energy. You talk about the market cost of the capital cost. So that's a distinction. I'm going to let it run down to two minutes and I'll save that for the rebuttal. I don't know if we'll get past all these problems and get to the remedy that was dismissed under the motion to dismiss, but it is one of the supreme ironies in this case is that in our first appeal, we lost our 42 USC 1983 arguments because there was a comprehensive remedy under PURPA. Now we find out under the rulings of this court is there is almost no remedy whatsoever except just jump up and down and see if the court will order the PUC to do something. There is no damages. There is no attorney's fees. I don't know how it could have been a comprehensive remedy to bounce us out of 1983 and now we don't have any remedies whatsoever virtually beyond just asking this court to order the district court to order PUC to order the utilities to follow the law. Good morning, your honors, and may it please the court. Christine Hammond for the California Public Utilities Commission. Your honors, I think it will be helpful to clarify the law on PURPA and to answer Judge Wen's questions. Avoided cost rates, the record choice that under the NEM program, the net energy metering program, the CPUC decided to compensate these customers which are netting their consumption against the generation generated on their rooftops that any excess energy delivered to the utility, and it's only if there is any excess energy delivered to the utility, that that customer is compensated at what is called the default load aggregation point, and the CPUC determined that it will use this default load aggregation point because it reflects the cost of energy on the day ahead market between the times of 7 a.m. and 5 p.m., and these are the times that would be expected that rooftop solar generators would be expected to deliver. PUC also found, and the district court correctly found, that there is really no capacity value that these rooftop solar generators offer to the utility. That's because under the NEM program, the size of the rooftop generator is supposed to match the expected demand of that customer, and that's based on that customer's actual history of taking from the utility. That being the case, there's very little expectation that that customer would deliver any excess electricity to the utility. So speaking about avoided cost rates, just taking a step back here, the United States Supreme Court and this court in 1994 in the case of Independent Energy Producers Association found that the CPUC is entitled to broad discretion to set avoided cost prices. Rate making is an area that is very fact specific, and it's an area where even FERC, itself a rate making authority, is reluctant to second guess states when states set avoided cost pricing. The market cost prices can be used to set avoided cost rates. Now CARES attorney has spoken about the cost data that a utility is required to provide, and that avoided cost rates should be based on a utility's costs. That's true in part. If you read the definition of avoided cost under PURPA and in FERC's regulation, it does speak about the cost that the utility avoids paying an alternative energy source, i.e. from a third party generator, or the cost that a utility avoids when it builds its own facilities. It's either or. It can be either one. Historically, the utilities had been the primary owners of generation resources. With deregulation and with the Federal Energy Regulatory Commission's push toward deregulation, utilities have become less and less owners of generating facilities in the market. It is true that PURPA was designed to accomplish two primary things, to reduce the nation's reliance on fossil fuels, and to promote the new construction of small power production, or QFs. These are often renewable generators. Now, the numbers in California bear out California's commitment to PURPA and success in implementing PURPA. The commission found, for instance, by the early 90s, there were 600 PURPA contracts that the three largest electric utilities in California had been committed to. By the early 90s, even though California was responsible for one-third of the energy demand in the West, 85% of QF capacity under contract in the West was in California. In terms of promoting the development of small power production, the record demonstrates that by year-end 2015, there were over 600,000 NEM customers. Although not in the record, more recent legislative reports demonstrate that at the present time, there are approximately 825,000 NEM customers in California. So the state is working to actively promote QFs, but really focusing on the renewables portfolio standards, which is separate from the PURPA program. It can overlap to some degree, and the state has PURPA programs that are discussed in the district court's order that are part of the renewables portfolio standard, for instance, the REMET program. But it's the state's renewables portfolio standard, which is really driving renewables development in California. I have a question for you on that. It relates to the avoided cost issue. Okay, here if we're looking at the cost that the utility avoids, what they avoid spending to get the energy that the small producer, who's a QF, would be providing. So we're looking at the utilities costs. If a state like California has an RPS, and they're required to get a certain amount of energy that's alternative derived energy, then do we look at the cost to the utility of getting all their energy, or do we look at the avoided cost that it would take to get renewable energy? As a general matter, FERC has determined that avoided cost pricing should be based on all sources available to the utility, including fossil fuel generation. And that was the subject matter in the order that CARES Council has referred to, that is the FERC order CPUC. It's entitled CPUC. It's 133 FERC 61059. FERC reaffirmed this longstanding commitment to look at a utility's avoided cost based on its entire portfolio. Now at the CPUC's request, the CPUC sought to come up with an alternative avoided cost pricing where there is actually a segment of procurement that's imposed on the utilities. And in that case, the state legislature said, we want you to really target highly efficient cogeneration. And the CPUC requested that FERC interpret that language, all sources available to a utility, to mean in the case of this segment of procurement, to refer only to that type of procurement, which is the highly efficient cogeneration. So going back to the broad discretion afforded to states, states can choose to focus more narrowly on the resources that are within a specific segment of procurement, but it need not. And that's how the district court read it as not being mandatory, but the opinion was somewhat duplicitous, wasn't it? Because the purpose of PURPLE was not altogether to encourage renewable energy, but it certainly focused on the development of renewable energy. And so, you know, we can read it both ways, can't we? I think you have to read PURPLE with the simultaneously and challenging goals in conjunction with each other. It is a challenge. It has been very difficult. We have been involved in decades of litigation, but states, states like California have been involved in decades of litigation. And they have been successful, highly successful in promoting QF development and in small power production that is renewables. It is not always used, not always using PURPLE, but PURPLE is an effective tool that the state has leveraged on several fronts. Let me, let me go back and ask you something about CPAP. So it says that if a state has a renewable portfolio standard, only renewable sources can be used to calculate avoided costs, right? Yes. So why shouldn't we follow that? I think, you know, attaching that to Judge Gould's question, why can't we read the FERC decision to, in CPAP, to say that, but why can't we read the FERC decision to say that? Because that's sort of what it said when it came out with the clarification ruling in 2010, isn't it? Yes. So I think there's, there's two things that we have to consider here. One is in general, the utilities have to meet certain procurement targets. It could be meeting the renewables portfolio standard, which for the most part is done outside of the context of PURPLE, because the generators that are participating there mostly are non-QFs. So that is consistent with the FERC statement that avoided cost pricing should be based on all sources available to the utility. In the NEM context, where a QF, or a facility that delivers a net excess of electricity to the utility, excuse me, sorry. It's okay. This is a complicated... It is. This is a very complicated case. The next increment of procurement. In the NEM context, the next increment of procurement that the utility would be otherwise avoiding by taking this excess electricity is actually so de minimis, and it will happen on a moment's notice. Because, like I said, the facility is sized to meet the demand of the customer. There's no expectation that a utility would have to go out and procure any excess electricity to serve that customer's needs. When it does, however, it is going to be on the open market, which is reflected in its pricing. Okay. Counsel, Judge Gould, can you hear me? Yes. But if, if what the statute is trying to do is encourage, to some degree, alternative energy suppliers to add, to add to the supply, then wouldn't you, doesn't that make sense that if we're talking about the utility paying avoided cost to a QF for part of the, part of the alternative energy that is required to be purchased by the state, like in California, under the RFS, that, that we should be looking at what, what the utility would have to pay to get that alternative fuel, not, not to get, say, fuel from an old coal-fired plant? So a number of things, Judge Gould. The procurement that a utility avoids is, is, is, is, is, is avoids by a NEM customer reducing its demand on the utility, does reduce the utility's requirement to procure more renewables to meet its RPS goals. And let me explain. When a NEM customer is generating solar on its rooftop, the utility doesn't get credit to meet its RPS goals. It is just reducing customer demand. By reducing customer demand, the utility conventionally reduces its overall procurement requirements to meet its overall RPS portfolio targets. Secondly, for the most part, as I mentioned, a utility's procurement of renewable power to meet its RPS goals does not happen in the context of NEM, in part because NEM procurement doesn't help the utility meet its RPS goals directly, only indirectly. And you are right, Judge Gould, that if we want to promote more renewable programs, not just one, as is the case in many states, not two, there's three presently. We can put those forward in our briefs. The CPC presently has another rulemaking open at the present time. It's not in the record here, but it is to design another avoided cost contract. I do want to address, Your Honors, the issue of two issues. Appellant's counsel has talked about the lack of remedies available to QFs such as themselves, except in federal court. PRPA itself talks about a dual enforcement scheme. There are PRPA implementation claims, which this case is. There are also as-applied claims. Implementation claims go to a state's implementation of PRPA, and whether or not the states are properly taking up the basic guidelines that are contained in the PRPA regulations and designing their programs consistent with those regulations, those are PRPA implementation claims, and those claims belong in federal court. There are as-applied claims, and those belong in state court. So if a utility is actually not complying with the state's implementation rules, that QF can take the utility to state court and seek relief there. All right, counsel. We're taking you over your time, so unless my colleagues have any additional questions. Judge Gould? Thank you very much. I think the question about whether or not, in theory, the NEMP customers are required to produce, if they want to boast about having $600,000 and now $850,000, you're no longer dependent on whether just one would stop doing it. You're talking about whether $850,000 would suddenly zero out, and that's not going to happen, and they know that. But more importantly, the record is clear that my clients tried to get a contract which would have bound them to provide their energy. They were forced into NEMP. For some reason, the court stated that they could have gotten a contract and they didn't, but the record is clearly established that they tried, tried, tried, and were denied it. So they can't make that argument given that refusal of the utility to give them the QF contract that they wanted, which would have made them bound to provide the energy, and then go back to the large scale of the $600,000 to $850,000 brings us to a different matter. Secondly, we laid out our response, the facts that we laid out about their various programs at pages 22 through 25 of our opening brief. We went through them line by line, chart by chart, why they were not including the capital costs, and they practically admitted, they're just saying they don't have to do it. But I do think they are required, at least when they present it as being a program for renewable energy, they have to count the costs that would be to replace the energy of those $850,000 they want to say now. That's what they have to establish. They have failed to do that. One last thing. PURPA was amended in 2008 because of their claims. They said they're doing a wonderful job. PURPA was amended so that the avoided cost requirement wasn't there anymore for the ones above 20 megawatts, and just left it with the smaller ones. So they got the relief that they wanted for doing the great job, but the Congress decided not to change it for the smaller ones, and that needs to stay the law today. Thank you.
judges: Gould, Nguyen, Marbley